NATIONAL ELEVATOR COMPANY v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.[1]

June 27, 1919.

No. 21,240.

**Carrier — switching charges — change in tariff.**

1. A schedule of rates published and filed by a railroad company, providing for the absorption by the company of the switching charges of connecting carriers at the destination of shipments, where, under its schedules of rates theretofore published and filed, the shipper was required to pay such charges, is a change in an existing tariff and not a "first instance" tariff within the meaning of chapter 176, Laws 1905.[2]

[1]Reported in 173 N. W. 418.    [2][G. S. 1913 §§ 4290-4297].

**Reduction in tariff — consent of R. & W. Commission.**

2. A change in the tariffs of a railroad company, voluntarily made, reducing rates to all shippers on all commodities, at all stations in this state, becomes effective without obtaining the consent of the Railroad and Warehouse Commission in the manner provided by chapter 176, Laws 1905.

**Restoration of original rate.**

3. After such a change has been made, the original rate cannot be restored without the consent of the commission after a hearing upon notice; a finding that the reinstatement of such rate will be a fair and reasonable change in rates, and an order or other action on the part of the commission sanctioning the change.

Action in the district court for Hennepin county to recover overcharges collected by defendant for switching charges on three carloads of grain. The case was tried before Hale, J., who made findings as set out at the beginning of the opinion and as conclusions of law found that defendant had the right, without obtaining the approval of the Railroad and Warehouse Commission and without any hearing to interested parties, to file with the commission Supplement No. 46 to its tariff G. F. D. 48,181, in terms effective December 18, 1906; that the tariff became effective on the date last mentioned and had ever since remained in full force and effect and was effective in fixing the lawful charges to which defendant company was entitled for the movements of the carloads of grain specified in paragraphs 17, 18 and 19; that the mere filing by defendant with the commission of subsequent tariffs containing changes in the rule contained in Supplement No. 46 and obtaining receipts therefor was not a compliance with the provisions of chapter 176, Laws 1905, and each and all tariffs so filed and purporting to make any such change were unlawful and never became effective, and ordered judgment in favor of plaintiff for $4.50. From the judgment entered pursuant to the order for judgment, defendant appealed. Affirmed.

*F. W. Root, Nelson J. Wilcox* and *J. N. Davis,* for appellant.

*Lancaster & Simpson, Harold G. Simpson* and *Frank J. Morley,* for respondent.

LEES, C.

This action was brought to recover switching charges paid by plaintiff

on three carloads of wheat which it shipped over defendant's line of railroad from Wheaton in this state to Minneapolis. A recovery was allowed after a trial by the court without a jury and this appeal was taken from the judgment.

The court found that plaintiff had an elevator at Wheaton, from which it shipped grain to Minneapolis and other terminal markets. Defendant is the only railroad company having a line at Wheaton. Prior to April 14, 1905, it had published and filed with the Railroad and Warehouse Commission of this state a tariff applicable to shipments of grain from Wheaton to Minneapolis, which contained no provision relative to the switching charges of its connecting carriers at Minneapolis.

On September 19, 1906, it published and filed with the commission a tariff, which provided in effect that switching charges on carload shipments from competitive points were included in the rates on such shipments or "absorbed."

On November 15, 1906, it published and filed another tariff providing for the absorption of such charges on carload shipments from all points in the state, whether competitive or noncompetitive, if its minimum net earnings were $15 per car.

Thereafter and prior to January 21, 1907, and effective on and after that date, it published and filed a tariff, naming the rates on intrastate shipments of grain, and providing that freight transported thereunder should be subject to the printed regulations relative to switching charges and the absorption thereof.

On January 28, 1907, it published and filed a tariff containing the following provision: "Rates named herein and in tariff as amended on grain to Minneapolis, Minnesota, do not include connecting line switching charges when shipments are for delivery on connecting lines."

On November 5, 1907, it published and filed a supplement to its tariffs, reading as follows: "Unless otherwise provided, rates named in tariff do not include connecting line switching charges when for cleaning houses, elevators or mills located on connecting lines at Minneapolis, Minnesota."

On April 14, 1905, chapter 176, p. 225, Laws 1905, became effective. The portions thereof which concern this case read as follows:

"Section 1. All common carriers subject to the laws of this state shall

have the right, in the first instance, to prescribe and publish, as required by law, all classifications and tariffs, rates and charges, together with rules governing the same. * * * This act shall include all terminal and switching charges. There shall be but one classification, which shall be uniform on all the railroads in this state, and shall govern in all state commerce."

"Sec. 3. The schedule of rates and charges for the transportation of freight and cars, together with the classification of such freights, minimum weights and rules now in effect, and all rates, charges and classifications published by any common carrier after the passage of this act, shall be deemed just and reasonable and shall not be changed except upon the order of or by the written consent of the Railroad and Warehouse Commission."

"Sec. 5. Any common carrier desiring to change or discontinue any published rate, charge * * * or rule governing the same, to which it is a party, shall make application to the commission in writing, stating the changes * * * desired, giving the reasons for such change. Upon receiving such application, the commission shall fix a time and place for hearing, and give such notice to interested parties as it shall deem proper and reasonable, and after hearing all the evidence offered, if the commission find that it is reasonable, fair and just to both shippers and carriers that the change should be allowed as asked for, it shall grant the application; otherwise it shall deny the same."

After the passage of this act, it was the practice of the commission, when a new tariff was filed, to cause it to be checked over by clerks in its office. If no change in existing rates or rules was contained therein, it would send the carrier a written acknowledgment of the receipt of the tariff. If changes were discovered, the receipt was withheld, and the carrier notified that they were not approved and required to make application in writing for leave to make them. At times clerks checking up a tariff would fail to discover changes in it, and would file and receipt for it without calling the attention of the commission to the change.

Each of the tariffs to which reference has been made were stamped "filed," with the date of filing, and receipt thereof was acknowledged. The commission never approved of any of the changes set forth in these tariffs, and no application in writing was ever made for leave to make

them.   There was no hearing upon and no order authorizing the proposed changes.

The shipments involved here were made during the year 1912, and defendant's net earnings thereon exceeded $20 per car.   Each car was delivered by defendant to a connecting carrier at Minneapolis.   Such carrier switched one car to a flour mill and one to a grain elevator, where each was unloaded.   The third car was switched to an elevator and the wheat disposed of in some manner not disclosed by the evidence.   These three shipments were selected as typical of the manner in which grain shipped to Minneapolis is usually handled.   In each case the switching charges of the connecting carrier were added by defendant to its charges for the line haul from Wheaton to Minneapolis and collected from plaintiff.

The sole question is whether defendant was bound to absorb these charges.

1. Before the Act of 1905 became effective, the statute provided that there should be but one terminal charge for switching a car within the limits of any municipality, and that, if the car must pass over the tracks of more than one railroad therein, the company first switching it should receive the entire charge for that service, and make an equitable division thereof with the other company.   It required carriers to print schedules of rates for public inspection, setting forth separately the terminal charges and any regulations that would change their aggregate rates and charges.   They were required to file copies of the schedules with the commission and to notify it of all proposed changes therein.   R. L. 1905, §§ 2012, 2013, 2014 and 2016.   In compliance with the statute, defendant had filed its schedules of rates.   They contained no provision for the absorption of switching charges.   By the first tariff filed after the Act of 1905 took effect, it reduced its rates by discontinuing switching charges on shipments from competitive points; and, by the second, by discontinuing such charges on shipments from noncompetitive points, if its net earnings on a car were $15.

Defendant argues that these were changes in its rates under its schedule filed with the commission prior to 1905.   Plaintiff asserts that they were "first instance" rates, within the meaning of section 1 of the Act of 1905, and might be put into effect without the consent of the commis-

sion. We are of the opinion that plaintiff's position is untenable, and that the new tariffs did bring about a change in rates. But the change was voluntarily made and reduced the rates to all shippers on all commodities at all railroad stations in the state. That such a change may be made without the consent of the commission was taken for granted when Steenerson v. Great Northern Ry. Co. 60 Minn. 461, 62 N. W. 826, was decided. We quote from the opinion in that case: Referring to the statute under consideration there, it was said:

. "We are of the opinion that the 'no higher, no lower,' feature of the subdivision (of the statute) is capable of but one construction. It was not the intention of the legislature to prohibit carriers from making reductions in tariffs at will, providing such reductions were uniform,—what are frequently called 'horizontal reductions.' This provision was designed, evidently, to thwart every attempt to evade the law or an order made under it by the raising of rates   *   *   *   changing of classifications at some stations   *   *   *   or to the detriment of some persons *   *   *. The result of such raising or lowering would be to unjustly discriminate as between persons and places, and this the statute will not tolerate."

By the act under consideration in the Steenerson case, it was made unlawful for a carrier to maintain a higher or a lower rate than that fixed by the commission, unless a court had decreed otherwise, while by the Act of 1905 changes in rates were prohibited, unless the consent of the commission was obtained. We attach no importance to the difference in the phraseology of the two acts. To prohibit the raising or lowering of a rate is equivalent to prohibiting a change of rates. Defendant contends that the portion of the opinion we have quoted was purely obiter, and that, as a statement of the law, it is fundamentally unsound. We do not so regard it.

Legislation affecting rates charged by common carriers has two principal ends in view: The first, to prevent the carrier from charging excessive rates; the second, to prevent discriminatory rates as between different shippers, different localities and different commodities. That these were the ends sought to be accomplished by the Act of 1905 becomes apparent when it is read as a whole and the conditions which then existed quite generally are taken into account. On no possible hypothesis

can it be said that a general horizontal reduction of rates on all commodities may be detrimental to the public, and ought not to be made without the consent of the commission as the representative of the public. Such a reduction was accomplished by the publication and filing of the two tariffs relating to the absorption of switching charges. We hold that they became effective without the consent or approval of the commission.

2. After defendant's rates had been reduced, they could not be advanced by restoring the old rates without complying with the provisions of section 5 of the Act of 1905. The same steps were taken by defendant on filing each of its several tariffs. We have already pointed them out. The court found that they were not such a compliance with the statute as is required. It appears that there was no hearing before the commission; that no notice was given to the interested parties; that there was no finding by the commission that the proposed reinstatement of the original rule as to switching charges was fair and reasonable, and that there was no order by or action on the part of the commission which sanctioned the change. Berwind-White C. M. Co. v. Chicago & Erie R. Co. 235 U. S. 371, 35 Sup. Ct. 131, 59 L. ed. 275, is cited by defendant to the point now under consideration. In that case it was held that the filing with the Interstate Commerce Commission of a book of rules relating to demurrage was a sufficient compliance with the Federal Act to regulate commerce, which required tariffs of interstate carriers to be filed and published. An examination of the Act of Congress discloses an entire absence of the specific provisions for a hearing after notice and for affirmative action by the commission upon an application for a change of rates, which are contained in section 5. We think the mere filing of its tariffs with the commission was not a compliance with the requirements of the act and that the finding of the learned trial court to that effect is correct. Bell Lumber Co. v. Great Northern Ry. Co. 135 Minn. 271, 160 N. W. 688.

It is to be noted that the changes in the tariffs of January 28 and November 5, 1907, affect only shipments of grain to Minneapolis. The effect of these changes was to make the rates on grain shipped there higher than they were at other places in the state. It is also to be noted that on all commodities shipped to Minneapolis, except grain, the switch-

ing charges were to continue to be absorbed. Upon their face, the changes appear to be discriminatory. There may have been valid reasons for making them, but we think they should have received the approval of the commission in the manner directed by the statute before they became effective.

Judgment affirmed.